**Mechele K. LINEHAN, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–10190.**

Court of Appeals of Alaska.

Feb. 5, 2010.

---

Susan Orlansky, Jeffrey M. Feldman, and Alexander O. Bryner of Feldman Orlansky & Sanders, Anchorage, for the Appellant.

Diane L. Wendlandt, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Richard A. Svobodny, Acting Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

### OPINION

MANNHEIMER, Judge.

Mechele K. Linehan appeals her conviction for first-degree murder. She challenges three evidentiary rulings made by the trial judge.

First, Linehan argues that the trial court improperly allowed the State to introduce evidence of a letter written by the victim of the homicide shortly before he was killed. In this letter, the victim asserted that if he died under suspicious circumstances, Linehan would probably be responsible for his death.

Second, Linehan contends that the trial court improperly allowed the State to introduce evidence that Linehan expressed admiration for, and a desire to emulate, the evil and manipulative female protagonist of the movie "The Last Seduction".

Third, Linehan argues that the trial court improperly allowed the State to introduce evidence that, during a portion of the time period involved in this case, Linehan made her living as an "exotic dancer"—that is, as a stripper.

For the reasons explained in this opinion, we conclude that it was error to allow the State to introduce evidence concerning the accusatory statements in the victim's letter—and we further conclude that this error requires reversal of Linehan's conviction.

In addition, to clarify matters for any retrial, we conclude that it was error to allow the State to introduce evidence of Linehan's statements about "The Last Seduction".

Finally, with regard to the evidence that Linehan worked as an exotic dancer, we conclude that this evidence was admissible to explain the relationship of the main actors in this case, and we further conclude that any potential error in the trial judge's ruling on this issue was harmless.

*Underlying facts*

Between mid–1994 and mid–1996 Mechele Linehan (whose name was then Mechele Hughes) maintained romantic relationships with several men, three of whom are important to this case: Scott Hilke, John Carlin, and Kent Leppink. Linehan's romantic relationships with these three men were essentially simultaneous, and all three men were aware (to a greater or lesser extent) of the nature of the others' relations with Linehan. Indeed, for several months, Linehan, Carlin, and Leppink all lived in the same house in Anchorage. (Hilke lived in California.)

On the morning of May 2, 1996, Leppink was found shot to death outside of the small town of Hope (about 90 miles by road from Anchorage). According to the pathologist's investigation, Leppink was killed sometime between 6 hours and 48 hours before his body was discovered—that is, sometime between mid-day on April 30th and the early morning hours of May 2nd.

When the Alaska State Troopers investigated this homicide, they interviewed Linehan, Carlin, and Hilke. However, the troopers were not able to identify any culprits, and the case remained unsolved for several years. In 2004, the state trooper "Cold Case Unit" re-opened the investigation. Based on a review of the earlier investigation, plus new witness interviews and a forensic examination of the e-mails and other materials recovered from two computers, the troopers concluded that Carlin had lured Leppink to Hope and had shot him there.

The troopers further concluded that Linehan was Carlin's accomplice—not that she physically assisted Carlin during the shooting, but rather that she solicited Carlin to commit this murder, and that she also helped Carlin compose a note that would be left for Leppink to find, and that would make Leppink want to go to Hope (by falsely making

him think that Linehan was staying there in a cabin with another man).

In March and April 2007, the State successfully prosecuted Carlin for this murder.[1] Following Carlin's conviction, the State brought Linehan to trial. Linehan's trial took place in the Anchorage superior court over the course of six weeks in September and October 2007.

The State's case was lengthy and detailed, but it was primarily circumstantial. In an effort to convince the jury to view the circumstantial evidence in a light that would support Linehan's conviction for murder, the State offered two pieces of evidence that had no direct relevance to the events being litigated, but which strongly suggested that Linehan was the kind of person who would conspire to have Leppink murdered.

The first of these pieces of evidence was a letter that Leppink sent to his parents on April 30th, shortly before his death. This letter was sealed inside another package, and Leppink instructed his parents to open the letter only in the event that he died under suspicious circumstances.

In this letter, Leppink told his parents that if he was found dead, Mechele Hughes (*i.e.*, Mechele Linehan), John Carlin, and/or Scott Hilke would probably be the ones responsible. Leppink told his parents that Linehan had a "split personality", and that "the part [he] fell in love with is very beautiful", but Leppink also admonished his parents "to take Mechele down", to "[m]ake sure she is prosecuted", and to "[m]ake sure they [*i.e.*, Linehan, Carlin, and/or Hilke] get burned".

The second piece of evidence was the testimony offered by Lora Aspiotis, who was Linehan's co-worker and friend until they had a falling out at the end of February 1996. According to Aspiotis, she and Linehan

would often watch movies together, and one of these movies was "The Last Seduction".

In her testimony, Aspiotis described the plot of this movie as follows:

[The story is about] a woman who's married to a doctor, and she ... talked him into doing [an illegal] drug deal, selling pharmaceutical cocaine, and he got $700,000.... [Later,] while he was in the shower, she stole the money, [and she] took off and went to a small town where a young man lived that she met at a bar. And she could tell right away that he was very naive, ... just [a] pretty innocent guy. And eventually she talked him into trying to murder her husband for the insurance.... [In the movie, the innocent young man] ended up in prison, and she went free with all the money.

According to Aspiotis, after she and Linehan watched this movie, Linehan told her that the protagonist "was her heroine", and that "she wanted to be ... just like her".

*Why we conclude that it was error for the superior court to let the State introduce the accusatory statements contained in Leppink's letter to his parents*

We turn first to the question of whether the State should have been allowed to introduce the portions of Leppink's letter to his parents in which Leppink asserted that Linehan had a "split personality", and that if he died under suspicious circumstances, Linehan, Carlin, and/or Hilke would probably be the ones responsible.

Under Alaska Evidence Rule 803(3), hearsay evidence may be introduced concerning a person's assertion about their own current state of mind (*i.e.*, their state of mind at the time they made the assertion). In other words, evidence of such an assertion is ad-

---

1. See the CourtView docket for *State v. Carlin*, File No. 3AN–06–10139 Cr. According to the superior court record, which is available online at:

    www.courtrecords.alaska.                gov/ pa/pa.urd/pamw2000.o_case_sum?98208999

    Carlin's trial took place over several weeks in March 2007, and on April 3rd the jury found Carlin guilty of first-degree murder.

    Following his sentencing, Carlin appealed his conviction to this Court. See *Carlin v. State*,

Court of Appeals File No. A–10155. However, before briefing of the appeal was completed, Carlin died in prison. Accordingly, this Court dismissed Carlin's appeal and abated the prosecution against Carlin *ab initio*. See "Order" dated December 12, 2008 in File No. A–10155. In other words, this Court set aside Carlin's conviction because he died before he could obtain appellate review of that conviction. See *Hartwell v. State*, 423 P.2d 282, 283–84 (Alaska 1967).

missible as proof of the matter asserted—*i.e.*, proof that the other person really did have that self-declared state of mind at the time they made the out-of-court assertion.

Sometimes, a person's state of mind will be an element of the claim being litigated—for example, a defendant's intent or knowledge, or a victim's apprehension of danger. In such cases, statements reflecting the pertinent aspect of the person's state of mind will be direct proof of a matter being litigated.

Generally, however, when hearsay evidence of a person's state of mind is relevant, that relevance will rest upon an inference about the person's related conduct. In some instances, evidence of the person's state of mind will be relevant because it tends to prove or disprove some assertion about the person's ensuing actions (or the person's failure to act). In other instances, evidence of the person's state of mind will be relevant because it tends to explain the nature of the person's actions—in the sense that the evidence tends to prove or disprove some assertion about the intent or knowledge with which the person acted.

Even though Evidence Rule 803(3) authorizes hearsay evidence of a person's statements concerning their own then-existing state of mind, the rule expressly declares that hearsay testimony concerning a person's beliefs is *not* admissible if it is offered to prove the *truth* of those beliefs. Such hearsay testimony is admissible only if it does not matter whether the person's belief was true or false—when the important point is the fact that the person *held* this belief (generally, again, because the fact that the person held the belief is relevant to proving or explaining their actions).

This second principle—that hearsay evidence of a person's belief is not admissible to prove the truth of that belief—is especially important in homicide prosecutions where there is evidence that the victim expressed apprehension that the defendant might do them harm.

As our supreme court stated in *Wyatt v. State*, 981 P.2d 109, 113 (Alaska 1999), "[e]vidence of a murder victim's fear of the accused is inadmissible if its only relevance is as circumstantial evidence of the *accused's* conduct". (Emphasis added) That is, the evidence is not admissible "if its probative value depends on the impermissible inference that, because the victim feared the accused, the accused likely did something [in the past] or planned to do something [in the future] to justify the fear." [2]

Evidence of the victim's statements expressing fear of the defendant, or expressing the belief that the defendant would harm them, is not admissible unless the State demonstrates that this evidence "is directly relevant to some [other] genuinely disputed issue". *Wyatt*, 981 P.2d at 113.[3] Normally, this means that the State must show that the *fact* that the victim held this belief (whether the belief was well-founded or not) is directly relevant to prove or explain the victim's actions (or failure to take action). In addition, the State must show that there is a genuine dispute between the parties concerning the aspect of the victim's conduct to which this belief pertains.

Thus, in *Wyatt*, a case in which the defendant was prosecuted for murdering his wife, the State's theory of the case hinged on the premise that Wyatt's wife was about to divorce him—and that, in response, Wyatt killed her because he feared losing control over his wife and over her money.

At trial, the State introduced evidence that the wife had expressed a fear of death at the defendant's hand if she pressed forward with her plans for a divorce. *Id.* at 111. The supreme court held that, even though this evidence tended to suggest that Wyatt's past actions provided good reason for his wife to fear him, or that Wyatt's subsequent actions conformed to his wife's fear (both improper purposes), the evidence was nevertheless admissible for a separate, proper purpose: it was relevant to prove *the victim's* subsequent conduct: "[The victim's] fearfulness of

---

**2.** Quoting this Court's decision in *Linton v. State*, 880 P.2d 123, 130 (Alaska App.1994), *affirmed on rehearing*, 901 P.2d 439 (Alaska App.1995).

**3.** Again, quoting this Court's decision in *Linton*, 880 P.2d at 130.

[Wyatt's] reaction served as a tangible measure both of how serious she was about obtaining a divorce[,] and of the likely imminence of her action." *Id.* at 114.

The supreme court further concluded that this evidence was directly relevant to a genuinely disputed fact—because, at trial, Wyatt actively disputed that his wife was serious about divorcing him. *Id.* Thus, the evidence met the test for admissibility.

Similarly, in *Linton v. State*, 880 P.2d 123 (Alaska App.1994), another case where a defendant was prosecuted for murdering his wife, this Court upheld the admission of evidence that the wife had told friends that she was afraid that Linton might do her harm, or that he might cause her to be deported to her home country—but she refused to leave him because she would not leave her children behind. *Id.* at 130.

We concluded that these out-of-court statements were admissible because they were directly relevant to a genuinely disputed issue "other than the happening of the event[s] which produced the [victim's] state of mind". *Id.*

As we explained in our opinion, after Linton's wife disappeared, "Linton made a number of conflicting statements indicating that [his wife] had left him for another man[,] or that she had returned home to Germany." *Id.* at 131. At trial, the State attempted to show that Linton's explanations were false—by proving that Linton's deceased wife would never have considered leaving without her two children. *Id.* The State's theory of the case was that Linton's wife's refusal to leave was the thing that motivated him to kill her—because their marriage was deteriorating and Linton wanted his wife to go home to Germany, leaving him with sole custody of their children. *Id.*

Given this evidentiary backdrop, we concluded that the challenged evidence of the wife's state of mind was relevant to prove *her* ensuing conduct, and Linton's reaction to that conduct:

[I]t [is] apparent that the state did not offer the testimony concerning [Linton's wife's] fear of Linton to prove that Linton had in fact previously harmed her or to

support the impermissible subsidiary inference that Linton's past acts of harm toward [his wife] made it more likely that he was her killer. Rather, the state offered this evidence to suggest a plausible motive for Linton's commission of the alleged [homicide]: that Linton resorted to murder when his attempts to talk [his wife] into leaving and his attempts to drive her away ... failed. For this purpose, the disputed evidence was admissible under [Evidence Rule] 803(3).

*Linton*, 880 P.2d at 131.

In other words, in *Linton* as in *Wyatt*, (1) the victim's state of mind was relevant to prove the victim's own ensuing conduct, and (2) the nature of the victim's ensuing conduct was actively disputed at trial.

■ With this discussion as a preface, we turn now to the evidence that is challenged in Linehan's case: the statements contained in the letter that Kent Leppink sent to his parents shortly before his death.

For purposes of this appeal, Leppink's letter contained two major accusatory assertions. The first of these assertions was Leppink's statement that, if he died under suspicious circumstances, Linehan, Carlin, and/or Hilke would be the ones responsible for his death. The second assertion was Leppink's statement that Linehan had a "split personality", and that one part of her personality—"the part [he] fell in love with"—was "very beautiful". The clear implication of this second assertion was that Leppink believed that Linehan also had a darker, murderous side to her nature. Indeed, while Leppink professed his continuing love for Linehan, he urged his parents to do everything in their power to "take Mechele down".

Despite the fact that these two assertions are contained in the same letter, the admissibility of each assertion was litigated at a separate time during the trial.

*(a) The admissibility of Leppink's assertion that, if he died under suspicious circumstances, the guilty parties were probably Linehan, Carlin, and/or Hilke*

The admissibility of the first accusatory assertion in the letter—Leppink's statement

that, if he died under suspicious circumstances, Linehan, Carlin, and/or Hilke would be the guilty parties—was litigated at a pretrial hearing shortly before the trial, and the trial judge announced his final ruling on this issue just before the parties delivered their opening statements to the jury.

During the parties' arguments on this issue, the prosecutor conceded that Leppink's statement could not be admitted to prove that Linehan probably had a hand in Leppink's death. Nevertheless, the prosecutor argued that, as was true in *Wyatt* and *Linton*, Leppink's statements about his own beliefs and fears were relevant to prove his ensuing conduct, or the reasons for his ensuing conduct.

Specifically, the prosecutor told the trial judge:

> *Prosecutor:* [Leppink's fear that Linehan and Carlin might kill him] ... tells us something about what's going [in Mr. Leppink's] mind with respect to these other people.... We have a man that is so obsessed, so adamant, so persistent about his relationship with [Linehan], and ... making [that relationship] work, that even though [Mr. Leppink] believes [that] it's very dangerous to him, he's [still] going to pursue it.[4]

Linehan's attorney argued that the accusatory statement in Leppink's letter should not be admitted, even if that statement might reveal something about Leppink's mental state, because Leppink's mental state was not going to be contested at trial—and thus the accusatory statement did not tend to prove, or refute, any dispute concerning Leppink's mental state or ensuing conduct.

The defense attorney explicitly told the trial judge that "no one is disputing [Leppink's] state of mind", and that the defense did not intend to "raise[ ] any challenge to [Leppink's] relevant mental state—[no challenge to the fact that], at the time that he went to Hope, he was in love with her, confused, wanted her back." In particular, the defense attorney stated that Linehan would not dispute that Leppink "was confused, and was looking for her in Hope", nor would Linehan dispute that "there were problems in their relationship at the time ..., [and] Leppink [believed] that they were engaged, [and] then he couldn't find her, and [he believed that] she was off with somebody else— and, as not atypical in [situations] of either jealousy or [doubt], he went and looked for her."

After hearing these arguments, the trial judge ruled that the State would be allowed to introduce Leppink's accusatory statement from the letter. The underlying problem with the trial judge's ruling on this issue is that the judge focused exclusively on the fact that Leppink's out-of-court accusatory statement was probative of his mental state, and the judge neglected to address the other aspects of the *Wyatt–Linton* test—whether the statement tended to prove anything about Leppink's mental state or his related conduct that would actually be disputed at trial.

In his preliminary ruling on this issue, the trial judge declared that Leppink's letter (including the accusation that Linehan and Carlin would be responsible for his death) "[was] a clear reflection of [Leppink's] emotional state at the time [he wrote the letter]". The judge pointed out that Leppink's statements in the letter tended to show that he was "torn between ... believing [that Linehan and Carlin] may be out to get him, and at the

---

4. During these same remarks to the trial judge, the prosecutor made one additional argument as to why Leppink's assertion might be admissible. The prosecutor argued that Leppink's accusatory assertion was relevant because it would have affected Linehan's and Carlin's perception of Leppink, and thus it might have affected Linehan's and Carlin's alleged decision to murder Leppink:

> *Prosecutor:* [Now, if Linehan and Carlin] don't want [Leppink] around for one reason or another, what [Leppink's letter] tells them is, "This guy ain't going away." You can't simply

tell him, "It's over; goodbye." Somebody with that mind set is simply not going to go away.... [He] is going to be very difficult to deal with.

But in response, the defense attorney pointed out that the statements in Leppink's letter could not possibly have affected Linehan's and Carlin's alleged decision to murder Leppink—because the contents of the letter did not come to light until after Leppink was killed. After the defense attorney pointed this out, the prosecutor never mentioned this argument again.

same time still wanting to reconcile with Ms. Linehan." The judge concluded that Leppink's statements in the letter were relevant because "his emotional state at the time . . . explains, or at least in part explains, or helps the jury understand, why he's maybe going to Hope—trying to find out things in Hope. Why, maybe, he's lured there by Mr. Carlin."

One week later (just before the parties' opening statements), the trial judge revisited this question and issued his final ruling. In this final ruling, the judge confirmed his earlier conclusion that Leppink's out-of-court statement was admissible:

> *The Court:* [A] central question in this case . . . is the [susceptibility] of Mr. Leppink to be lured or manipulated because of his feelings about Ms. Linehan. . . . It's something that goes directly to both Mr. Leppink's actions [and] the defendant's actions in this case. And that [vulnerability] to be lured or manipulated . . . can only be understood . . . in the context of the letter he writes to his parents. . . . [I]n the letter[, not only] does he express an unrequited love for Ms. Linehan, [but] he also expresses this belief that Ms. Linehan is one of the people who might do him harm. . . . And that reflects a depth of . . . commitment to Ms. Linehan, and I think makes it understandable how he can be manipulated to put himself in a vulnerable position, or to be lured to Hope, as the State argued in [Mr. Carlin's] trial.
>
> . . . I am persuaded by [the fact that] in *Wyatt* . . . the court held that evidence of [Mrs. Wyatt's] determination to divorce [her husband, the defendant], despite [her] fear of a lethal situation, demonstrated the seriousness of her purpose and intent, and, therefore, was probative of her state of mind and plan for future action. You substitute a few words here, and we have the same situation [in this case]. Evidence of Mr. Leppink's determination to pursue and stay in a relationship with Ms. Linehan, despite . . . the fear of a lethal situation coming from her, demonstrates the seriousness of his purpose and intent, and is, therefore, probative of his state of mind and plan for future action.

In other words, the trial judge concluded that Leppink's statement asserting his belief that Linehan and Carlin might try to kill him was relevant because (1) the fact that Leppink would put aside this fear demonstrated the depth of his infatuation with Linehan, and (2) the depth of Leppink's infatuation with Linehan—"the seriousness of his purpose and intent"—was "probative of his plan for future action" and helped to explain "how he [could] be manipulated to put himself in a vulnerable position, or to be lured to Hope".

As we noted earlier, the problem with the trial judge's analysis is that, under *Wyatt* and *Linton*, the fact that Leppink's out-of-court statement revealed something about his emotional state, or revealed his conflicted feelings about Linehan, is not sufficient, by itself, to justify the admission of Leppink's accusatory statement. Our law requires the proponent of this type of evidence to show that the particular state of mind revealed by the victim's out-of-court statement is relevant to a disputed issue in the case.

■ In particular, under *Wyatt* and *Linton*, the proponent of the evidence must show that the victim's state of mind tends to prove that the victim engaged (or did not engage) in specific conduct that will be disputed at trial, or that the victim's state of mind tends to prove that the victim performed this conduct with a particular intent, motive, or knowledge that will be disputed at trial.

When the parties argued this issue, the defense attorney affirmatively declared that the defense would not be disputing any aspect of Leppink's mental state or conduct that the State was trying to prove with the accusatory out-of-court statement. Under *Wyatt* and *Linton*, after the defense attorney declared that the challenged evidence was not relevant to any disputed issue, the judge had to resolve this question before the judge could decide whether the evidence was admissible.

If the judge believed that the defense attorney was wrong—that is, if the judge could already identify a disputed issue to which the challenged evidence was relevant—the judge could point out this disputed issue. Alternatively, the judge might not know enough about the case (*i.e.,* enough about how the

parties intended to litigate the case) to be able to identify which factual issues would be disputed. In that event, the judge could ask the prosecutor to expressly identify the victim's actions or mental states that the State intended to prove with the out-of-court statement, and then the defense attorney either could concede that these actions or mental states would be disputed, or expressly confirm that they would not be disputed. And, of course, another possibility is that the judge might agree with the defense attorney that the challenged evidence was not relevant to any disputed issue—in which case the judge would exclude the evidence.

But in Linehan's case, the trial judge did none of these things. Even though the defense attorney expressly argued that the proposed evidence was not relevant to any disputed issue, the trial judge failed to resolve this question.

This error might have turned out to be insignificant if the trial evidence had, in fact, revealed a genuine dispute about Leppink's feelings toward Linehan, or about Leppink's ensuing actions. But the opposite is the case.

■ As we explained above, a victim's mental state is sometimes relevant because that mental state is an element of the State's proof-but that was not the case here. A charge of first-degree murder does not require proof that the victim had any particular mental state. Thus, if Leppink's mental state had relevance, that relevance had to lie in the fact that Leppink's mental state was circumstantial evidence tending to prove or disprove his ensuing actions, or tending to explain the nature of his actions (*i.e.,* the intent, motive, or knowledge with which he engaged in those actions).

When the trial judge explained why he concluded that the State should be allowed to introduce the accusatory statement in Leppink's letter, the core of that ruling (which we quoted more fully earlier) was the trial judge's conclusion that, if Leppink was willing to continue his relationship with Linehan despite his fear that Linehan and Carlin might kill him, this demonstrated "a depth of … commitment to Ms. Linehan [that] makes it understandable how he [could] be manipu-

lated to put himself in a vulnerable position, or to be lured to Hope, as the State argue[s]".

The fact that Leppink was infatuated or even obsessed with Linehan was obviously relevant to explain why he would go to Hope looking for her, and why he might risk taking Carlin along with him on his second trip to Hope. But there was no dispute that Leppink engaged in these actions—no dispute that Leppink was lured to Hope, or that he was manipulated into asking Carlin to accompany him to Hope on his second trip, thus putting himself in a "vulnerable position" that allowed Carlin to murder him.

In particular, there was no dispute that Leppink went to Hope on two occasions shortly before his death—the first time, on the weekend of April 27th–28th, and the second time, on April 30th or May 1st. There was no dispute that, on both occasions, Leppink was looking for Linehan, and that his motivation for doing so was jealousy, frustration, and doubt about their relationship. And there was no dispute that, on the second occasion, Leppink allowed Carlin to accompany him—and that Carlin murdered him. The disputed issue was whether Linehan was Carlin's accomplice in this murder.

Moreover, there was no dispute at trial concerning the depth of Leppink's infatuation with Linehan. The record is replete with evidence that Leppink was infatuated with Linehan—and that he repeatedly refused to abandon his relationship with her, even though he knew that she was seeing other men, and even though his lawyer and members of his family advised or warned him that he should end the relationship.

Leppink's lawyer, Brian Brundin, testified that Leppink came to see him several times in April 1996 (*i.e.,* the last month of his life). On April 18th, Leppink revised his will to make Linehan the primary beneficiary of his estate. (Up until that time, the primary beneficiaries had been Leppink's parents.)

The next day, April 19th, Leppink returned to Brundin's office, asking about the possibility of suing North Star Hospital (a mental care hospital in Anchorage). Accord-

ing to Brundin, Leppink said that he visited North Star Hospital because he had heard that Linehan was getting counseling there, and he wanted to check up on her. The hospital staff told Leppink that they could not discuss another person's treatment with him—and then the hospital staff apparently alerted Linehan that Leppink had been making inquiries about her. This upset Leppink; he believed that the hospital staff had violated some duty of confidentiality by revealing that he had come to the hospital asking questions about Linehan.

During this same April 19th visit, Leppink informed Brundin that Linehan was having an affair with Carlin, a man who lived in the same household with Leppink and Linehan. (Brundin's notes refer to this man as "Carlin", but the reference to Carlin is obvious.)

Although Leppink referred to Linehan as his "fiancée" when he spoke about her to Brundin, it seemed to Brundin that this was not a good relationship for Leppink, and that this would not be a happy marriage. Brundin told Leppink his thoughts on this matter.

One week later, on April 26th, Leppink returned to Brundin's office, and he was again angry. He told Brundin that Linehan had left, that he did not know where she was, and that his expensive computer was missing, along with some rugs and a bronze statue that Leppink asserted was worth at least $4000. Leppink told Brundin that he had just removed Linehan as the beneficiary of his life insurance policy, and now he wanted to remove her as the beneficiary of his will (the one he had just signed eight days earlier). Acting on Brundin's advice, Leppink tore up the April 18th will in Brundin's presence—thus reactivating the earlier will that made Leppink's parents the beneficiaries of his estate.

The statements and events of Leppink's visit to Brundin's office on April 26th might appear to indicate that Leppink had considered Brundin's warning and had decided to take Brundin's advice and end his engagement to Linehan. But the next day (or perhaps the day after), Leppink was down in Hope, showing people a photograph of Linehan and asking if they had seen her. He told

people that the photograph was of his "fiancée".

Leppink's mother, Betsy Leppink, also testified about conversations she had with Leppink in April 1996. Mrs. Leppink testified that she received a telephone call from her son toward the end of April. Leppink told her that he was calling from Girdwood, and that he was on his way to Hope. He added, "Mom, you know [that] often I can't find Mechele. She's missing again, and I want to find her; I need to find her. And I have learned that she's in Hope."

Leppink's mother tried to talk him out of it. She said, "Kent, have you even been in Hope? ... [I]t's [just] a little ... village. There's just nothing there. Where would she be in Hope?" Leppink replied that Linehan was "in a cabin", and when his mother continued to protest, he added, "Well, I have reason to believe that's where she is, and that's where I'm going."

Later in the same conversation, Leppink mentioned that he had received his "first wedding gift": a million-dollar insurance policy on his life, purchased by Linehan's grandfather. Leppink's mother testified that she was "shocked" at this news:

> *Mrs. Leppink:* I said, "What are you saying?" And he repeated [what he had said], and I said, "Kent, that's sick, that's absolutely sick. I've never heard of such a thing in all my life." And I said, "And now you're going to Hope—[but] she can't be in Hope; there's nothing there but a little fishing village." And I was afraid for him, and I told him that. I said, "Don't go; don't go alone; and just get out of there."

As we explained a few paragraphs earlier, Leppink disregarded his mother's warnings and proceeded to Hope, where he asked about Linehan and showed her photograph to people. That was the weekend of April 27th–28th. Mrs. Leppink spoke to her son after he returned to Anchorage. She asked him if he had found Linehan, and he told her that he had not. But then he added, "John Carlin knows where she goes, and he won't tell me."

Then, on the morning of April 30th (which was either the day of Leppink's death, or the

day before it), Leppink called his brother Craig in Michigan, and they spoke for about an hour and a half. In this conversation, Leppink expressed concern that he could not find Linehan; he told his brother that "he hadn't seen her in a week, [and he] didn't know where she was." Leppink also told his brother that Linehan had taken his laptop computer and bronze statue.

Leppink's brother told him that there were "other fish in the ocean"—in other words, that if Leppink's relationship with Linehan was not working out the way he wanted, there were other women. But according to his brother's testimony, Leppink "was very adamant" about not wanting any other woman. He told his brother, "No, I really love [Linehan]; I really love this lady." Leppink's brother testified that Leppink was "goofy" about Linehan—that he was "like a love-struck puppy".

There was yet additional testimony suggesting that Leppink was aware of Linehan's relationships with the other men and that, despite this knowledge, he remained caught up in his relationship with her.

When the troopers searched Leppink's vehicle following his death, they found one of Scott Hilke's business cards and a reservation in Hilke's name at a hotel in Natchez, Mississippi. And during Hilke's testimony, he described an incident that occurred while he and Linehan were spending time together in Metairie, Louisiana (outside of New Orleans): Leppink showed up in Metairie unexpectedly—and he even served coffee to Hilke and Linehan when they were in bed together.

None of the foregoing testimony was disputed by Linehan's attorneys at the trial. In other words, there was no genuine dispute concerning Leppink's infatuation with Linehan, or the conflicted nature of Leppink's feelings toward Linehan, or the actions that Leppink took which were motivated in whole or in part by those feelings.

We further note that when the prosecutor delivered his summation to the jury, he never asserted (either in his opening summation or his rebuttal) that the contents of Leppink's letter proved anything about Leppink's actions or about Leppink's state of mind. In fact, the prosecutor did not even mention Leppink's letter, or any statement contained in that letter, in this context. (The prosecutor did mention Leppink's letter in another context, which we explain later in this opinion.)

For these reasons, we conclude that it was error for the trial judge to allow the prosecutor to present evidence of the first accusatory statement in Leppink's letter to his parents—Leppink's assertion that, if he died under suspicious circumstances, Linehan, Carlin, and/or Hilke would probably be the ones responsible for his death.

*(b) The admissibility of Leppink's assertion that Linehan had a "split personality"*

■ The error with respect to the first accusatory statement in the letter was compounded by the trial judge's decision to allow the prosecutor to present evidence of the second accusatory statement in Leppink's letter—Leppink's assertion that Linehan had a "split personality".

The admissibility of this statement was not litigated at the same time as the first. Rather, the defense raised this issue during the fourth week of trial (on Monday, October 8, 2007), when the State called Leppink's mother to the stand and proposed to have her read the text of Leppink's letter into the record.

At this point, the trial judge had already ruled that Leppink's first accusatory statement could be presented to the jury, but the defense asked the trial judge to redact Leppink's comment in the letter about Linehan having a split personality. The trial judge denied the defense attorney's request. Here is the text of the judge's ruling:

> *The Court:* I don't take [the "split personality"] statement as some kind of medical or clinical diagnosis of Ms. Linehan that Mr. Leppink was making—even [if it] were being offered for the truth [of the matter asserted], which it's not.
>
> [Mr. Leppink's assertion that Ms. Linehan has a split personality] strikes me as the kind of comment that people in relationships often make about one another. And certainly Mr. Leppink had enough of

a relationship [with Ms. Linehan] to have observations about Ms. Linehan, and he shared them in this letter. . . .

In the context of [the letter], I don't find [this assertion to be] unduly prejudicial to Ms. Linehan at all. And it sort of sets in context [Mr. Leppink's] own kind of split reaction to her: on the one hand, accusing her of being involved in his death, [and] on the other hand, expressing his undying affection toward her and asking [his] parents to continue to visit her, even if she goes to jail—matters that I thought were relevant to his own state of mind. So the objection . . . to [the "split personality"] statement is overruled.

This ruling suffers from the same flaw as the trial judge's earlier ruling regarding the first accusatory statement. It may be true that Leppink's assertion that Linehan had a split personality revealed something about Leppink's state of mind. But this assertion revealed nothing about any issue that was disputed at trial.

Moreover, the trial judge was wrong when he concluded that this "split personality" assertion posed no danger of unfair prejudice to Linehan. Viewed in the context of the other assertions that Leppink made in this letter, Leppink's assertion that Linehan had a split personality posed a clear danger of unfair prejudice.

Leppink was obviously asserting that Linehan had two distinct and contradictory sides to her personality. In his letter, Leppink described one side of Linehan's personality as "beautiful", and he declared that this was "the part [he] fell in love with". Leppink did not expressly characterize the second side of Linehan's personality. But given the context of the other assertions that Leppink made in his letter, Leppink's clear implication was that the other side of Linehan's personality was conniving and homicidal.

This is not "the kind of comment that people in relationships often make about one another". It is an assertion of Linehan's fundamental immorality or duplicity, and it significantly enhances Leppink's accusation of murder. Moreover, Leppink's assertion about Linehan's purported split personality constituted an implicit warning to the jurors

not to give any credence to the exculpatory explanations that Linehan or her attorneys might offer to the murder charge.

For these reasons, we conclude that it was error for the trial judge to allow the prosecutor to present evidence of this second accusatory statement in Leppink's letter to his parents.

*(c) Whether these errors require reversal of Linehan's murder conviction*

■ The State argues that any error in the trial judge's rulings was harmless because there was an independent basis for admitting Leppink's first accusatory assertion (Leppink's statement that, if he died under suspicious circumstances, Linehan, Carlin, and/or Hilke were probably responsible).

(The State fails to offer any alternative justification for the trial judge's decision to admit Leppink's second accusatory assertion—the "split personality" statement.)

According to the State, Leppink's first accusatory statement was admissible to explain *Linehan's* state of mind—more specifically, to explain her apparent willingness to cooperate during her May 5th interview with the state troopers.

To establish that the accusatory out-of-court statement was probative on this point, the State relies on the testimony of Leppink's brother, Lane Leppink.

Lane Leppink (who lived in Michigan) testified that he learned of his brother's death on May 4, 1996. Because he knew that Linehan was his brother's fiancée, Leppink called Linehan to make sure that she knew about his brother's death. According to Lane Leppink's testimony, he spoke to Linehan by telephone that day (May 4th), as well as several more times during the following days.

In his testimony about his May 4th conversation with Linehan, Lane Leppink was asked if he "indicate[d] to her that she should be careful because [his] parents would blame her". His answer was, "Conversation like that did get spoken, yeah." However, it is apparent from Lane Leppink's testimony that his May 4th comment to Linehan (about

his parents blaming Linehan for the death) was *not* based on the accusatory statement contained in his brother's letter—because Leppink repeatedly stated that he did not learn about his brother's letter until the next day, May 5th.

Lane Leppink did testify that, after he learned about his brother's letter, he had further conversations with Linehan in which he mentioned his brother's accusation. But neither the defense attorney nor the prosecutor asked Leppink to clarify exactly *when* he told Linehan about this accusation.

At the end of the trial, when the parties made their arguments to the jury, the prosecutor did not once mention Leppink's letter during his opening summation. The prosecutor made one mention of the letter during his rebuttal summation, in the context of trying to explain why Linehan was apparently so forthcoming with information when she was interviewed by the state troopers on May 5th. Here is the prosecutor's argument:

> *Prosecutor:* Now, [about] the [defense attorney's] reference to [Linehan] volunteering information about the life insurance, and volunteering information about the Hope note [during her May 5th interview with the troopers]: There is no reference by her to either one of those things, the Hope note or the life insurance, until her interview on May the 5th.
>
> You'll recall that on May the 4th she's had extensive conversations with Lane Leppink. And Lane Leppink has learned about the package that [his brother] Kent sent home, [the letter that was] in it, and what the allegations are. So by the time [Linehan] is interviewed on May the 5th, she knows very well that the police know about life insurance, and that everybody knows he was down in Hope when he was killed. And [the troopers] haven't [yet] found the Hope note, remember.... So this woman is not without brains. This is an intelligent ... woman who ... knows exactly when she should admit, and when she should not admit.

The prosecutor's argument rests on two major misstatements of the evidence.

First, as we have just explained, the testimony does not support the prosecutor's assertion that Lane Leppink informed Linehan on May 4th about the accusation contained in his brother's letter. In fact, the testimony contradicts the prosecutor's assertion. Lane Leppink testified that he himself was not aware of the letter and its accusation until May 5th.

(As we noted earlier, Lane Leppink did testify that, after he learned of his brother's letter on May 5th, he informed Linehan about the letter in a later conversation. But neither attorney asked Leppink to specify the date or time of that later conversation.)

Second, the troopers *had* found the Hope note by the time they interviewed Linehan on May 5th. According to the testimony of Trooper David Tullis, the troopers found the note in the glove compartment of Kent Leppink's car when they searched the car on May 4th.

We note, moreover, that the prosecutor's argument runs contrary to the various cautionary instructions that the trial judge gave to the jurors about the contents of Kent Leppink's letter. Both during the presentation of the evidence and at the end of the trial (following the summations of the parties), the trial judge instructed the jurors that they could use the assertions in Leppink's letter for only one purpose: these assertions could be considered only to the extent that they revealed *Leppink's* state of mind. Here, for example, is the instruction that the jurors received at the very end of the trial:

> *The Court:* Evidence of a letter Kent Leppink wrote to his parents was introduced for the purpose of showing his state of mind close to the time of his death. You have previously been instructed that the letter could be considered only for the limited purpose of deciding Kent Leppink's state of mind. As previously instructed, you may not consider that evidence for any other purpose. It may not be considered as proof of whether John Carlin III, Mechele Linehan, or Scott Hilke did in fact participate in the murder of Kent Leppink. Do not consider or discuss [this] evidence

for any other purpose. It would [be] improper and unfair for you to do this.

Under the terms of this cautionary instruction, the jurors were forbidden from considering the assertions in Leppink's letter for the purpose that the prosecutor argued— that is, for the purpose of assessing *Linehan's* state of mind or her strategy when dealing with the troopers.

In its brief to this Court, the State again argues that the accusatory statement in Leppink's letter to his parents was independently admissible to explain why Linehan appeared to be cooperative with the troopers during the May 5th interview. The State concedes that Lane Leppink did not know about his brother's letter when he spoke to Linehan on May 4th. However, the State asserts that the trial testimony shows that Lane Leppink told Linehan about the letter on the following day, May 5th.

This is not accurate. The trial testimony shows that Lane Leppink informed Linehan of the accusation contained in his brother's letter, and that he *might* have informed Linehan about this accusation as early as May 5th. But, as we have already explained, Leppink's testimony contains no information as to exactly when he first spoke to Linehan about the letter. And because this question of fact was never presented to the trial judge, we have no ruling as to exactly when Lane Leppink first informed Linehan of the accusation contained in his brother's letter.

■■■ On appeal, the appellee (that is, the party seeking to defend the lower court's decision) is entitled to argue for affirmance of the trial court's ruling on any ground revealed by the record.[5] However, when the appellee argues that the trial court's ruling should be upheld on alternative grounds, the appellee's argument must rest on undisputed facts.[6]

Here, the State's alternative argument is that the accusatory statement in Leppink's letter was relevant because Linehan's *knowledge* of this accusatory statement helps to explain Linehan's conduct during her May 5th interview with the state troopers. This argument hinges on the assertion that Linehan learned of the accusatory statement in Leppink's letter before she was interviewed by the troopers on May 5th. Because the State's proposed alternative ground for affirming the trial judge's ruling rests on a factual assertion whose truth is not obvious from the record, and which the trial judge had no occasion to address or resolve, we must reject the State's argument.

■■■ This brings us, then, to the question of whether the erroneous admission of the two accusatory statements in Leppink's letter to his parents was so prejudicial to the fairness of Linehan's trial that we must reverse the jury's verdict.

To answer this question, our first task is to identify the applicable standard for assessing whether the error requires reversal.

Linehan asserts that the erroneous admission of the accusatory statements in Leppink's letter violated her Sixth Amendment right of confrontation as defined in *Crawford v. Washington*,[7] and thus we must apply the standard that governs cases of constitutional error: that is, we must reverse her conviction unless we conclude that the error is harmless beyond a reasonable doubt.[8]

Given our conclusion that Leppink's out-of-court accusation was not admissible for any proper purpose, and given the fact that Leppink obviously intended for his parents to convey his accusation to the authorities, there is an argument to be made that Lep-

---

5. *See, e.g., Demoski v. New*, 737 P.2d 780, 786 (Alaska 1987) ("An appellee may seek to defend a judgment on any basis established by the record, whether or not it was relied on by the trial court or even raised before the trial court"); *Millman v. State*, 841 P.2d 190, 195 (Alaska App.1992) (same).

6. *See Koyukuk River Tribal Task Force on Moose Management v. Rue*, 63 P.3d 1019, 1021 n. 8 (Alaska 2003).

7. 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

8. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *Love v. State*, 457 P.2d 622, 633 (Alaska 1969).

pink's out-of-court accusation should be deemed "testimonial" hearsay under *Crawford*, and that we should therefore reverse Linehan's conviction if we are not convinced that the error was harmless beyond a reasonable doubt—that is, if we believe that there is any reasonable possibility that the error affected the jury's verdict.

■ However, we conclude that we need not resolve the question of whether the accusatory statements in Leppink's letter were testimonial hearsay—because we conclude that the error in admitting these statements requires reversal of Linehan's conviction even under the standard that applies to non-constitutional errors. Under this standard, we must reverse Linehan's conviction unless we are able "to fairly say that the error did not appreciably affect the jury's verdict".[9] For the reasons we are about to explain, we conclude it is likely that the error did appreciably affect the verdict in this case.

Many courts have noted the extremely prejudicial and inflammatory nature of a victim's accusatory statements "from the grave". *See, e.g., People v. Coleman,* 38 Cal.3d 69, 211 Cal.Rptr. 102, 111, 695 P.2d 189, 198 (1985); *State v. Prudden,* 212 N.J.Super. 608, 515 A.2d 1260, 1263 (App. 1986); *State v. Downey,* 206 N.J.Super. 382, 502 A.2d 1171, 1178 (App.1986). Even in cases where the victim's accusatory statement was found to be properly admitted to prove or explain the victim's ensuing actions, appellate courts have acknowledged that this type of evidence is fraught with inherent dangers, and that it requires rigid limitations on its admission and its use by the jury. *See United States v. Brown,* 490 F.2d 758, 766 (D.C.Cir.1973).

When the victim of a murder was involved in a close relationship with the person accused of the murder, and when the jury hears evidence that the victim feared or predicted that they would meet death at the hand of the defendant, it is a natural tendency for the jury to surmise (in the words of our supreme court in *Wyatt*) that "[if] the victim feared the accused, the accused likely did something [in the past] or planned to do something [in the future] to justify the fear."

In Linehan's case, when the prosecutor delivered his opening statement, the prosecutor informed the jurors of the accusation contained in Leppink's letter. Thereafter, the prosecutor asked several witnesses to confirm that Leppink had accused Linehan and Carlin of being the ones responsible for his death. We note, specifically, the testimony of retired state trooper Ron Belden, the testimony of Leppink's mother, Betsy Leppink, and the testimony of Leppink's brother, Lane Leppink.

It is true that, in Linehan's case, the trial judge instructed the jurors that the accusatory statements in Leppink's letter could be considered only for the purpose of ascertaining Leppink's state of mind near the time of his death. The prosecutor likewise reminded the jurors of this limitation. But the repeated incantation of "state of mind" could not cure the prejudice of this evidence.

No one ever explained to the jurors how, or why, Leppink's belief or suspicion that Linehan and Carlin might conspire to kill him had any bearing on the jury's decision of the case. Indeed, as we have explained at length in this opinion, Leppink's accusation had no bearing on the jury's decision of the case—except for the improper inference that, if Leppink had an intimate relationship with Linehan, and if he feared her or suspected her of wanting to kill him, then there must have been some good reason for his fears or suspicions.

We note that courts of other jurisdictions have generally rejected the claim that the erroneous admission of this type of evidence is harmless. *See, e.g., Clark v. United States,* 412 A.2d 21, 30 (D.C.App.1980); *State v. Ulvinen,* 313 N.W.2d 425, 427–28 (Minn. 1981); *People v. Lew,* 68 Cal.2d 774, 69 Cal. Rptr. 102, 105–06, 441 P.2d 942, 945–46 (1968); *People v. Hamilton,* 55 Cal.2d 881, 13 Cal.Rptr. 649, 657, 362 P.2d 473, 481 (1961);[10] *People v. Coleman,* 116 Ill.App.3d

---

9. *Dague v. State,* 81 P.3d 274, 282 (Alaska 2003); *Love,* 457 P.2d at 632.

10. *Overruled on other grounds in People v. Wilson,* 1 Cal.3d 431, 82 Cal.Rptr. 494, 462 P.2d 22, 29–30 (1969).

28, 71 Ill.Dec. 819, 451 N.E.2d 973, 977 (1983).

In *Shepard v. United States*, 290 U.S. 96, 54 S.Ct. 22, 78 L.Ed. 196 (1933), the Supreme Court reversed the defendant's conviction for the murder of his wife because the trial judge permitted the prosecutor to introduce a statement made by the wife three weeks prior to her death, in which she accused the defendant of poisoning her. The Supreme Court rejected the government's various theories as to why this evidence was properly admissible, although the Court conceded that the wife's statement might have been relevant to negate any suggestion that she had purposely committed suicide.[11]

In spite of this possible relevance, the Court held that the admission of the wife's out-of-court accusation was prejudicial error. The Court stated:

> It will not do to say that the jury might accept the [wife's] declarations for any light that they cast upon the [wife's will to live], and reject them to the extent that they charged [her] death to [someone] else. Discrimination so subtle is a feat beyond the compass of ordinary minds. The reverberating clang of those accusatory words would drown all weaker sounds.

*Shepard*, 290 U.S. at 104–06, 54 S.Ct. at 25–26.

Likewise, in *State v. Prudden*, the New Jersey appellate court rejected the argument that the trial judge's limiting instruction was sufficient to prevent the jurors from improperly using the victim's out-of-court accusation as proof of the defendant's likely conduct: "[W]e are convinced that even had more precise limiting instructions been given, they would have been to no avail. The reverberating clang of the accusatory words contained in the [victim's] letter 'would drown all weaker sounds'." *Prudden*, 515 A.2d at 1263 (quoting *Shepard*, 290 U.S. at 104, 54 S.Ct. at 25).

Or, as the California Supreme Court stated in *People v. Coleman*,

> Although the trial court ruled [that] the letters' contents [were] admissible only for the limited purposes of impeaching [the] defendant's credibility and to explain and challenge the basis for the opinions of the psychiatric experts, and [although the trial court] carefully instructed the jury on these limited proper uses for the letters, we agree with [the] defendant that these instructions did not—and could not—adequately insure that the letters would not be considered as proof of the truth of the hearsay accusations they contained.
>
> . . .
>
> How could the jury possibly disentangle the charges in [those] letter[s] and treat the letter[s] only as evidence of state of mind, and forget about the substance of the charges?

*Coleman*, 211 Cal.Rptr. 102, 695 P.2d at 196, 198.[12]

In the present case, we likewise find that the trial judge's limiting instructions were ineffective to cure the prejudice of the erroneously admitted evidence. The jury heard several witnesses testify that, shortly before Leppink was killed, he wrote a letter accusing Linehan of complicity in his murder—essentially, an accusation from the grave. Moreover, the State's evidence was not limited to witnesses' characterizations of the letter. During the prosecutor's direct examination of Leppink's mother, Betsy Leppink, the prosecutor and Mrs. Leppink read the text of the letter aloud to the jury.

As we have already noted, neither the prosecutor nor the trial judge ever offered the jury any explanation as to how or why the state of mind revealed by the two accusations in Leppink's letter (Leppink's assertions that Linehan and Carlin might murder him, and that Linehan had a "split personality") made any difference to any aspect of the jury's decision in this case. This being so, it is almost inevitable that the jurors would view Leppink's assertions as at least circumstantial proof of the matters asserted. In other words, the jurors would suspect that Leppink probably knew what he was talking about—and that, if Leppink believed that

---

**11.** *Shepard*, 290 U.S. at 99–102, 54 S.Ct. at 23–25.

**12.** Quoting *People v. Talle*, 111 Cal.App.2d 650, 245 P.2d 633, 645 (1952).

Linehan had a "split personality" and was capable of plotting to murder him, there was probably some good basis for those beliefs.

The unfair prejudice of this type of evidence is most acute in a prosecution like this one, where the State's case is based almost entirely on circumstantial evidence. The State's ability to secure a guilty verdict hinged on convincing the jury to view a large number of ambiguous facts in the light most favorable to Linehan's guilt. In this situation, the evidence of Leppink's posthumous accusations may well have been the weight that tipped the jury's decision.

As we explained earlier, we must reverse Linehan's conviction unless we are able "to fairly say that the error did not appreciably affect the jury's verdict". Here, we believe there is a substantial possibility that the error *did* affect the verdict. Accordingly, we reverse Linehan's conviction.

Although we have concluded that Linehan's conviction must be reversed because of the improper admission of the accusatory statements contained in Leppink's letter, we will also address the other two evidentiary rulings that Linehan challenges in this appeal, to provide guidance to the superior court in the event that Linehan is retried.

*Why we conclude that it was error for the superior court to let the State introduce testimony that Linehan admired and wished to emulate the protagonist of the movie, "The Last Seduction"*

Linehan challenges the trial judge's decision to allow the prosecutor to introduce evidence that Linehan admired and wished to emulate the homicidal protagonist of the movie, "The Last Seduction". In order to explain our analysis of this question, we must first describe the trial evidence concerning Leppink's life insurance.

In mid–1995, and again in early 1996, Linehan told Leppink that she would marry him. In February 1996, Linehan and Leppink visited an insurance agent and applied for insurance policies on their lives. Initially, they wished to purchase $1,000,000 insurance on each of their lives, but the insurance company would only insure Linehan's life for $150,000. On April 1, 1996, after the under-

writing was complete and the company had agreed to issue the policies, Linehan paid the premium for both policies. Leppink was the sole beneficiary of Linehan's policy (*i.e.,* he would receive a death benefit of $150,000), and Linehan was an 80–percent beneficiary of Leppink's policy (*i.e.,* she would receive a death benefit of $800,000). (The remaining 20 percent was to go to Leppink's parents.)

During the month of April, Leppink returned to the insurance agent several times to change the beneficiary designation on his policy. On April 22nd, Leppink removed Linehan as a beneficiary and instead designated his parents as the sole beneficiaries. The next day, April 23rd, Leppink removed his parents as beneficiaries and made Linehan the sole beneficiary. On that same day, Leppink asked the insurance agent about canceling the policy and getting his money back.

Then, three days later (April 26th), Leppink again removed Linehan as a beneficiary and designated his father, his mother, and his brother Ransom as the three beneficiaries. This was the status of the policy when Leppink died a few days later.

*(a) A description of the challenged evidence and of the trial judge's rulings on this evidence*

It was the State's theory that Linehan conspired to have Leppink murdered so that she could collect the life insurance. To support this theory, the prosecutor asked the trial judge for permission to present the testimony of Lora Aspiotis, a woman who was Linehan's friend from 1994 through February 1996.

The prosecutor told the trial judge that Aspiotis would testify that, in late 1995 or early 1996, she and Linehan watched the movie "The Last Seduction" together. According to the prosecutor, Aspiotis would testify that Linehan declared that "the protagonist [of this movie] was her heroine", and that she "wanted to be just like her". The prosecutor argued that Aspiotis's testimony on this point was probative of Linehan's guilt because the protagonist of "The Last Seduction" was "very manipulative", and because the movie told the story of a woman who

"[set] up a husband to be murdered by getting involved with another man who is manipulated into believing [that] the circumstances are not what they [really] are".

When the defense attorney objected to this proposed evidence, arguing that it was prohibited evidence of Linehan's bad character, the trial judge was openly skeptical of the defense attorney's assertion. The judge repeatedly challenged the defense attorney to explain how a person's act of watching a movie, or even a person's act of declaring that they identified with an evil character in a movie, qualified as a "bad act" under Evidence Rule 404. The trial judge also challenged the defense attorney to identify how the proposed evidence would create a risk of unfair prejudice, or how the proposed evidence would have any tendency to lead the jurors to decide Linehan's case on an improper basis.

The trial judge ultimately ruled that the prosecutor would be allowed to present Aspiotis's proposed testimony:

*The Court:* I don't think the remark by Ms. Linehan that ... "she's my heroine" is an act as contemplated by [Evidence Rule] 404(b). I think that [it is] an admission, and its admissibility under that analysis would be governed by Evidence Rule 403—[in other words,] is ... that admission more prejudicial [than probative].

I find that its probative value is important to the jury. It is a statement that [tends] to reflect a certain intent and identification with the particular lead actress in that plot, or the person in that movie. There are some similarities between that movie and what happened here. And, in my view, given the State's theory that this was part of a plan that unfolded over months, her state of mind months before, and her identification with this particular person as her heroine, is a relevant consideration for the jury.... It is [her] admission of identification with the ... perpetrator [of the murder] in the movie.

...

[S]ince the defendant has urged a [Rule] 404(b) analysis with respect to Ms. Aspiotis's testimony about the movie, I think I do need to address [that issue]. I think, in the context of this case, if [Ms. Linehan's reaction to the movie] was determined to be an "act" for [purposes of Rule 404], ... [then] it is evidence that goes to intent, preparation, and plan.

Where I differ with [defense counsel] about the analysis of those particular factors is that I think they're really case-specific, and there does not necessarily have to be an extremely close proximity in terms of time, or extremely close identity in terms of acts, for the evidence to be necessarily admissible. I think you need to look at it in the context of the particular cases and the claims asserted by the State in its theory of the prosecution. And here the claim is one of a plan that appeared to evolve over months. I see a sufficient nexus between the plot line of this particular movie, where a lover is used as a vehicle to kill a husband, to establish [this] defendant's intent, preparation, and plan over months in engaging Mr. Carlin ... to commit this particular homicide.

So ... I do find that the evidence, if considered as an "act", is ... admissible for the purposes of establishing intent, preparation, or plan. [Under] the same analysis I [explained] earlier, I find that its probative value outweighs its prejudicial effect on the jury. And I will permit Ms. Aspiotis to testify to her understanding of the content of the movie and Ms. Linehan's admission about it.

Following this ruling, the prosecutor called Aspiotis to the stand. Aspiotis testified that she was friends with Linehan from 1994 until February 1996, when they ended their friendship. During the time they were friends, Aspiotis would often watch movies with Linehan at John Carlin's house in south Anchorage. Aspiotis then told the jury about "The Last Seduction":

*Ms. Aspiotis:* [There was one movie, "The Last Seduction",] about a woman who's married to a doctor, and she had talked him into doing [an illegal] drug deal, selling pharmaceutical cocaine, and he got $700,000 [from selling the cocaine].... [Later,] while he was in the shower, she stole the money, [and she] took off and went to a small town where a young man

lived that she met at a bar. And she could tell right away that he was very naive, ... just [a] pretty innocent guy. And eventually she talked him into trying to murder her husband for the insurance.

*Prosecutor:* And how did [the movie] end?

*Ms. Aspiotis:* [The naive young man] ended up in prison, and she went free with all the money.

*Prosecutor:* ... What was [Linehan's] reaction to that movie?

*Ms. Aspiotis:* She told me that [this woman] was her heroine, and that she wanted to be ... just like her.... She was talking about the character [in] the movie[.]

Later in the trial, the prosecutor asked the trial judge to allow the State to hold a screening of the entire movie for the jurors. The prosecutor told the trial judge that the State's case against Linehan hinged on having the jury adopt a particular view of a web of circumstantial evidence, and that the strength of the State's case would be significantly enhanced "if the State comes in with [evidence of] a plan, with [evidence of] a motive that [Linehan] has [expressly] adopted". That evidence, the prosecutor asserted, was Linehan's statement to Aspiotis about the main character in "The Last Seduction"—her statement, "That's my heroine. I would like to be just like her." The prosecutor argued that the jury should be allowed to see the entire movie, to give the State "actual evidence to back [its theory] up—a piece of evidence that shows the plan that fits all of what's going on[.]"

The prosecutor conceded that the evidence might be "inflammatory"—but he argued that Linehan should not be heard to object on this ground:

*Prosecutor:* If [this evidence] is inflammatory, [Ms. Linehan] has adopted that inflammatory nature, whatever may be in there. She has looked at this character, and she has said, "I want to be like that person"—who is pretty bad—and "I want to do something like that person has done"—which is pretty bad. And then she has carried it out in this case. So, yeah, in that respect, [the evidence is inflammato-

ry]. But she's the one that looked at [the movie]; she's the one that adopted it.... She said, "That's what I want to be like, and that's what I want to do." And to the extent that ... you could call that inflammatory, that's what she said; that's what she adopted.

But, by now, the trial judge had taken the time to watch "The Last Seduction" for himself, and he was having second thoughts about the admissibility of this evidence. The judge described the plot of the movie in some detail on the record. He conceded that there were some similarities between the plot of the movie and the State's theory of Linehan's case, but he noted that "there are a lot of differences". (The judge then described many of these differences.)

The trial judge also stated that he now agreed with the defense attorneys that the State had failed to establish any temporal proximity between Linehan's statements about the movie and the occurrence of Leppink's murder. The judge explained that, when he ruled on the admissibility of Aspiotis's testimony, he was under the impression that the watching of the movie, and Linehan's statements about the movie, had taken place in February 1996 (*i.e.,* about two months before the murder). But when Aspiotis testified, she could not remember when these events had occurred—thus diminishing the probative value of the evidence.

The trial judge concluded:

*The Court:* [A]lthough there is some similarity in the theme [of the movie], the theme of manipulation, there are too many differences between the facts [of] this case, as I've heard them and as alleged [by the State], and the [plot of the] movie—differences that, when I read the case law on admitting these movies, would seem to be significant. We don't have a situation here of repeated viewings [by the defendant], or [of] stark similarities between scenes in the movie and the crime in question. There are significant difference[s] here[.]

...

[This evidence] seems to me to have a tendency to let jurors convict [Ms. Linehan] because of her identification with a

character in the movie who committed other murders and a large theft, rather than on the basis of the evidence in this case.

Based on these conclusions, the trial judge not only denied the State's request to screen the movie for the jurors, but the judge also barred the State from introducing any more testimony describing the plot of the movie:

> *The Court:* Ms. Aspiotis ... described the plot line in a sufficiently accurate sense that [the testimony] ought to be left at that. And I think this piece of evidence has to stand [or] fall on its own legs, as it is....

*(b) Why we conclude that the admission of this testimony was error*

The trial judge's initial ruling on this issue was flawed by the mistaken dichotomy that the trial judge drew between (1) admissions of a party opponent and (2) evidence of bad character.

The fact that a particular out-of-court statement was made by a party-opponent means that evidence of the statement is admissible despite the normal bar on hearsay evidence. *See* Evidence Rule 801(d)(2). However, it is a completely separate question whether this out-of-court statement is barred by the rules that govern the admissibility of evidence of a person's character. *See* Evidence Rules 404 and 405.

For example, the defendant in a robbery case might remark to a police officer that he habitually cheats at cards. If the prosecution wished to introduce this statement at the defendant's trial by calling the officer who heard the defendant make the statement, there would be no hearsay objection to the proposed testimony—because the officer heard the defendant utter the out-of-court statement, and because the out-of-court statement is an admission of a party opponent. But the defendant might well have an objection to this evidence under Evidence Rule 404(a), because the proposed evidence appears to have no relevance to the robbery charge except to prove the defendant's bad character.

In the present case, the State proposed to introduce evidence (1) that Linehan had expressed admiration for the scheming, treacherous, murderous villain in "The Last Seduction", and (2) that Linehan had declared that she wanted to be "just like" this villain.

Linehan had no hearsay objection to this proposed evidence. It was her own statement, it was being introduced through the testimony of a witness who personally heard her make the statement, and the evidence was being offered by her opponent in the litigation (the State). But this evidence clearly raised concerns under Evidence Rule 404, because it tended to prove Linehan's bad character and it was apparently being offered to show that Linehan acted true to character. Thus, the trial judge committed error when he initially failed to analyze the proposed evidence as character evidence under Evidence Rule 404.

When this issue was litigated, the trial judge repeatedly asked the defense attorney how the act of watching a movie, or even a statement of admiration for a villainous character in a movie, could qualify as a "bad act" for purposes of Evidence Rule 404(b). It is true that courts and attorneys often use a shorthand when they speak about Evidence Rule 404(b): they refer to the rule as governing evidence of "bad acts". But Rule 404(b) is not limited to evidence of conduct that qualifies as a crime or conduct that would generally be regarded as immoral. Rather, it applies to evidence of any conduct that tends to prove a person's bad character.

By its very language, Rule 404(b) applies to all evidence of "other crimes, wrongs, *or acts*". And as the Commentary to Alaska Evidence Rule 404(b) explains, this rule is merely "a specialized ... application of the general rule [stated in Evidence Rule 404(a)] excluding circumstantial use of character evidence."

Evidence Rule 404(a) declares that evidence of a person's character is normally not admissible when it is offered as circumstantial evidence that the person acted in conformity with their character on a particular occasion. And even when evidence of a person's character is admissible under one of the exceptions to this general rule, Evidence Rule 405 declares that, in most instances, the person's character must be established by

reputation or opinion evidence, and not by evidence of specific instances of the person's behavior.

Alaska Evidence Rule 404(b)(1) is essentially an amalgam of these two concepts. Rule 404(b)(1) declares that evidence of a specific instance of a person's behavior is not admissible when the sole purpose of this evidence is to prove the person's character so that the person's character can then be used as circumstantial evidence that the person acted in conformity with their character on another occasion. This is a restatement of the principles codified in Rule 404(a) and 405. Indeed, as Professors Saltzburg, Martin, and Capra note in their treatise on the Federal Rules of Evidence, "The first sentence of Rule 404(b)[ (1) ] . . . is probably unnecessary in light of [the general rule stated in] Rule 404(a)." [13]

■ Given the purpose of Evidence Rule 404(b), it is evident that the rule applies not just to acts that are intrinsically "bad", but rather to any and all conduct that is offered as a specific manifestation of a person's character.[14] Thus, Rule 404(b)(1) would apply to evidence that a defendant has expressed admiration for, or a desire to emulate, a notorious villain—if that evidence was being offered to prove the defendant's character, so that the defendant's character could be used as circumstantial evidence of the defendant's behavior on another occasion.

On the other hand, neither Evidence Rule 404(a) nor Evidence Rule 404(b) bars evidence simply because the evidence tends to demonstrate a person's bad character. These two rules bar the evidence only if the purpose of the evidence is to prove, circumstantially, that the person acted true to character on the particular occasion being litigat-

ed. If the evidence is legitimately being offered for a different purpose, then Rules 404(a) and 404(b) do not bar the evidence.

When litigation occurs under Evidence Rule 404(b)(1), the dispute most often arises because the proponent of the evidence asserts that they are *not* offering the evidence for the prohibited purpose of establishing character, but instead for some other case-specific, non-character purpose (such as the ones listed in the second sentence of the rule). The trial judge must then decide whether the proposed evidence truly has a case-specific, non-character relevance, or whether the "evidence has no genuine purpose other than to show the defendant's character and the consequent likelihood that the defendant acted in conformity with that character during the episode being litigated". *Smithart v. State*, 946 P.2d 1264, 1270–71 (Alaska App.1997).[15]

In the present case, the State proposed to introduce evidence that Linehan had expressed admiration for, and a desire to emulate, the main character in "The Last Seduction"—a woman who manipulated men and who was a treacherous murderer. If the primary relevance of the proposed evidence rested on the assertion that people who admire murderous villains can be expected to act like those villains if given the opportunity, then the evidence should have been excluded under Evidence Rules 404(a)-(b). On the other hand, if the proposed evidence had a significant, case-specific relevance other than using Linehan's purported character as circumstantial evidence of her actions, then the evidence would not be barred by Rules 404(a)-(b), and the trial judge would then be obliged to weigh the probative value of the evidence against its potential for unfair prejudice under Evidence Rule 403.

---

**13.** Stephen A. Saltzburg, Michael M. Martin, and Daniel J. Capra, *Federal Rules of Evidence Manual* (9th ed.2006), Vol. 1, p. 404–20.

**14.** *See United States v. Vega*, 188 F.3d 1150, 1154 (9th Cir.1999): "[Federal Evidence Rule 404(b) ] applies to all 'other acts,' not just bad acts. . . . Thus, despite the fact that there is nothing intrinsically improper about Vega's prior border crossings or bank deposits, they are nonetheless subject to 404(b)." *See also Huddleston v. United States*, 485 U.S. 681, 685, 108 S.Ct. 1496, 1499, 99 L.Ed.2d 771 (1988), where the Supreme

Court described Federal Evidence Rule 404(b) as "generally prohibit[ing] the introduction of evidence of *extrinsic acts* that might adversely reflect on the actor's character, unless that evidence bears upon a relevant issue in the case such as motive, opportunity, or knowledge." (Emphasis added)

**15.** Our decision in *Smithart* was reversed by the Alaska Supreme Court, but on another ground. *See Smithart v. State*, 988 P.2d 583 (Alaska 1999).

The parties have alerted us to several court decisions dealing with the question of whether evidence of a defendant's admiration for the protagonist of a movie, or the defendant's obsession with a movie, should be admissible when the defendant is prosecuted for committing a crime similar to the criminal acts portrayed in the movie.

Conceivably, a defendant's admiration for the protagonist of a movie might be probative of the defendant's plan or intent to commit acts similar to those committed by the protagonist. But many law-abiding people are drawn to characters in literature or in the cinema who are villainous or roguish—even though they would not dream of engaging in the same crimes or misdeeds. Moreover, even if a defendant's statement of admiration for a villain really did manifest the defendant's true character, evidence of the defendant's statement would be barred by Evidence Rules 404(a) and 404(b)(1) if the evidence had no genuine purpose other than to establish, circumstantially, that the defendant probably acted true to character on some occasion.

For these reasons, courts require the government to show a particularly close nexus between the protagonist or the plot of a movie and the defendant's charged criminal acts before this type of evidence will be admitted.

Thus, in *Oree v. State*, 280 Ga. 588, 630 S.E.2d 390, 393–94 (2006), the court found that the evidence was admissible because the defendant watched the movie on the night of the homicide and had watched it several times before, and because certain details of the murder mirrored the actions of the murderous character in the movie. In *Rushin v. State*, 269 Ga. 599, 502 S.E.2d 454, 456 (1998), the defendant owned a video of the movie and watched it repeatedly, and (again) there were certain distinctive details of the murder that mirrored the murder portrayed in the film. In *Beasley v. State*, 269 Ga. 620, 502 S.E.2d 235, 238 (1998), the defendant watched the movie twenty times. And in *Jones v. State*, 780 N.E.2d 373, 377–78 (Ind. 2002), the defendant rented the movie just a week before the murder, and several significant details of the homicide (the murderer's use of a knife, his infliction of numerous stab wounds to the victim's back, and his act of washing the knife in the victim's kitchen sink after the attack) mirrored the details of the murder portrayed in the movie.

In the present case, the trial judge made two rulings on this issue. In the first of these rulings, the judge concluded that evidence of Linehan's admiration for the protagonist of "The Last Seduction" was admissible for the purpose of establishing her intent, preparation, or plan. In other words, the judge found that this evidence tended to show that Linehan conspired with Carlin, or that she manipulated Carlin, to accomplish the murder.

But after the trial judge heard Aspiotis's testimony, and after the judge had a chance to personally view the movie and to review the cases in this area, the judge essentially changed his mind. In his second ruling (made in response to the State's request to play the entire movie for the jury), the judge declared that "there [were] too many differences between the facts [of] this case ... and the [plot of the] movie". The judge pointed out that "[w]e don't have a situation here of repeated viewings [by the defendant], or [of] stark similarities between scenes in the movie and the crime in question. [Instead, t]here are significant difference[s] here[.]"

Given the absence of a close nexus between the movie and the actual crime, the trial judge concluded that the primary effect of the evidence would be to prompt the jurors "[to] convict [Ms. Linehan] because of her identification with a character in the movie who committed other murders and a large theft, rather than on the basis of the evidence in this case."

This ruling, of course, gave rise to another significant issue: what to do about the testimony that Aspiotis had already given? As we explained previously, the trial judge decided to let Aspiotis's testimony stand, but to curtail the State from introducing any other evidence about the movie:

> *The Court:* Ms. Aspiotis ... described the plot line in a sufficiently accurate sense that [the testimony] ought to be left at that. And I think this piece of evidence

has to stand [or] fall on its own legs, as it is. . . .

The problem with this approach is that Aspiotis's description of the plot of "The Last Seduction" was *not* "sufficiently accurate". Instead, it was misleading. Aspiotis described the actions of the movie's protagonist this way:

> [S]he met [a young guy] at a bar. And she could tell right away that he was very naive, ... just [a] pretty innocent guy. And eventually she talked him into trying to murder her husband for the insurance.

This description makes the plot of the movie sound like the State's view of Linehan's case—a murder that was plotted to obtain life insurance benefits. This is a misleading portrayal of the movie. The protagonist of "The Last Seduction" did manipulate a young man to kill her husband, but she did not do so with the intention of collecting life insurance benefits. Rather, she plotted her husband's murder so that her husband would not be able to pursue her and retrieve the $700,000 that she had stolen from him.

In other words, evidence of Linehan's statements about this movie should not have been admitted in the first place—and the jury heard an account of the movie that was misleadingly favorable to the State's case. These errors should not be repeated at any retrial.

*Why we conclude that the trial judge did not abuse his discretion when he allowed the prosecutor to elicit testimony that Linehan met the men involved in this case through her work as an "exotic dancer"*

▮ Before Linehan's trial began, the parties litigated the question of whether the State should be allowed to introduce testimony that Linehan worked as an exotic dancer.

The prosecutor argued that Linehan's work as an exotic dancer was relevant because that was how she became acquainted with Leppink, Carlin, and Hilke. The prosecutor asserted that Linehan's employment as an exotic dancer was a fact that "weave[d] throughout her relationships with [these] men"—that it explained why the men were "accustomed to ... giv[ing] money [to her]", and it also explained the "certain amount of

rivalry that [was] going on ... between [the men]."

The prosecutor promised the trial judge the State "[would] not attempt to use, or attempt to attribute to [Linehan], any kind of label or any kind of character simply because she was an exotic dancer".

The defense attorney argued that it would be prejudicial to the fairness of the trial to let the State use the label "exotic dancer"—because everyone understands that this phrase is a euphemism for "stripper". The defense attorney further argued that most people assume that strippers are not just dancing with their clothes off; rather, "they are involved in other acts that would be illegal [and] unsavory to most people". Finally, the defense attorney contended that, despite the State's protestations, the State did want to rely on the fact that Linehan worked as an exotic dancer to prove her character—specifically, to prove that she was skilled at manipulating men for her own ends.

The trial judge concluded that the State should be allowed to refer to the fact that Linehan worked as an exotic dancer:

> *The Court:* [W]ith regard to [this] issue ..., I have the benefit of having heard most of the State's evidence in a prior trial [*i.e.*, John Carlin's trial]. And ... some facts ... are so inextricably woven into the fabric of [the] case, in terms of understanding ... the relationships between people, the possible motivations of people, that [these facts] become relevant and important ... regardless of whether ... they are directly related to [the] essential elements of the crime. In this case, ... understanding how those people interacted together, how they met, what motivations they might have had to compete with one another and/or be manipulated by Ms. Linehan—if that's the State's theory—is all related to ... Ms. Linehan's employment.
>
> The jury would have a far better understanding of the relationships between the various people who were living with Ms. Linehan at the time, and competing for her affections, by understanding how they met, [and] the context of how they met her.

[And] putting [a] characterization on her employment, she was a performer. The fact that she was a performer enables [the jury] to understand how and why she related to the various people [in this case], including Mr. Carlin, [and his son], and Mr. Leppink. And I think that it is one of those things that is necessary for the jury to have a complete understanding of the case—and, indeed, how and why the crime may [have] occurred here. [I]t's the State's theory that Ms. Linehan [was] an aider and abetter, or manipulated others into committing the crime here. I think [the jurors will] have a better understanding of how that could have happened by understanding what her employment was at the time.

This ruling has two components. The trial judge first concluded that Linehan's employment as an exotic dancer was relevant to explain her relationships with the various men involved in this case, and to explain the men's relationships with each other. Second, the trial judge concluded that Linehan's employment as an exotic dancer was relevant to explaining her conduct in this case and her influence over the men. Specifically, the judge concluded that, because Linehan was a "performer", this made it more likely that she manipulated Carlin into committing Leppink's murder.

The first portion of this ruling is the kind of decision that was properly within the trial judge's discretion. However, the second portion of the trial judge's ruling poses difficult questions.

In this second portion of the ruling, the trial judge found that Linehan's employment was relevant because it demonstrated that she was likely a skilled manipulator. The judge's ruling was apparently based on the following rationale: (1) Linehan's success as an exotic dancer hinged on her skill as a "performer"—her ability to manipulate men into spending large sums of money by convincing them that she cared about them, or that they would obtain some benefit by doing this; and thus (2) Linehan's employment as an exotic dancer was circumstantial evidence that she could, and would, manipulate Carlin to murder Leppink.

Under this reasoning, the trial judge was essentially approving the use of Linehan's profession as character evidence.

As we explained above, when this matter was litigated in the superior court, the prosecutor expressly declared that he would not use the evidence for this purpose-that he would not "attempt to attribute to [Linehan] ... any kind of character simply because she was an exotic dancer". Moreover, this use of the evidence is seemingly prohibited by Evidence Rule 404(a).

However, we have reviewed the entire transcript of Linehan's trial, and the prosecutor never attempted to use evidence of Linehan's employment as an exotic dancer for the purpose of proving her character. The prosecutor never argued or suggested that, because Linehan worked as an exotic dancer, she was more likely to have manipulated a man into committing a murder for her own ends. Thus, to the extent that the second portion of the trial judge's ruling may have been error, that error did not prejudice Linehan.

### Conclusion

For the reasons explained here, we conclude that the judgement of the superior court must be reversed, and that Linehan is entitled to a new trial.

COATS, Chief Judge, concurring.

COATS, Chief Judge, concurring.

Shortly before his death, Kent Leppink sent a letter to his parents. The letter contained a sealed envelope. Leppink directed his parents to not open the sealed envelope unless something "fishy" happened to him.

After Leppink died, his parents opened the envelope. In a note contained in the envelope, Leppink stated that if he died under suspicious circumstances that "Mechele, John [Carlin] or Scott [Hilke] were the people, or persons that probably killed me. Make sure they get burned." He instructed his parents to "[u]se the information enclosed to take Mechele down. Make sure she is prosecuted." Leppink's accusations that were con-

tained in the note are the key evidence in question in this appeal.

All of the authority of which we are aware holds that these "accusations from the grave" are extremely prejudicial. As Judge Mannheimer states in his majority opinion:

> Many courts have noted the extremely prejudicial and inflammatory nature of a victim's accusatory statements "from the grave". *See, e.g., People v. Coleman,* [38 Cal.3d 69,] 211 Cal.Rptr. 102, 111, 695 P.2d 189, 198 (Cal.1985); *State v. Prudden,* [212 N.J.Super. 608,] 515 A.2d 1260 (N.J.App. 1986); *State v. Downey,* [206 N.J.Super. 382,] 502 A.2d 1171 (N.J.App.1986). Even in cases where the victim's accusatory statement was found to be properly admitted to prove or explain the victim's ensuing actions, appellate courts have acknowledged that this type of evidence is fraught with inherent dangers, and that it requires rigid limitations on its admission and its use by the jury. *See United States v. Brown,* 490 F.2d 758, 766 (D.C.Cir.1973).

(In addition, in *State v. Sanchez,*[1] the court found that admission of this kind of accusation to support the inference that the victim feared the accused or that the accused was the perpetrator violates the confrontation clause of the United States Constitution. The court held that because "the intended audience [of the note] reasonably included law enforcement and the circumstances surrounding the note indicate that an objective declarant reasonably should have anticipated that the State would make use of the statements at trial ... [the] note was testimonial ...").[2]

Decisions of the Alaska Supreme Court are consistent with these holdings. In *Wyatt v. State,*[3] the court stated that the fact that a murder victim feared the accused is inadmissible "if its probative value depends on the impermissible inference that, because the victim feared the accused, the accused likely did something or planned to do something to justify the fear."[4]

The State does not dispute this authority. The State concedes that Leppink's accusations that "Mechele, John or Scott were the people, or persons that probably killed me" would be inadmissible hearsay if it was offered "to prove the truth of Leppink's prediction that Linehan would kill him." The State argues that the note was admissible "to explain Leppink's actions shortly before the murder—actions which could only be understood when viewed in relation to the confusion reflected in Leppink's letter ...".

As Judge Mannheimer points out in the opinion of the court, there was, however, no dispute concerning Leppink's deep infatuation with Linehan and his confused feelings about her, nor was there any dispute concerning Leppink's actions. The easiest way to demonstrate this is to discuss the "Hope note." This was the note that Linehan participated in writing that lured Leppink to Hope, where he was murdered.

Linehan conceded that in April of 1996, she had arranged to take a trip to Sacramento and Lake Tahoe so that she could be with Scott Hilke, who was then living in California. Linehan was gone between April 25 and May 2. Before she left, she and Carlin wrote a note that they placed where Leppink would find it. The note, purportedly from Carlin, mentioned a cabin which he had worked on for Linehan in Hope. The letter implied that Linehan would be at the cabin "this weekend" with another man. At the bottom of the note was a handwritten message from Linehan indicating "please don't let anyone know where we are at."

It is uncontested that the note was a fabrication and that there was no cabin in Hope. On the weekend of April 27, Leppink traveled to Hope looking for Linehan. It was during this time that Leppink changed the beneficiaries on his life insurance three times, tore up the will that named Linehan as the beneficiary, and wrote the letter to his parents. The parties do not dispute that Leppink contacted Carlin to help him find

---

**1.** 341 Mont. 240, 177 P.3d 444, 451–53 (2008).

**2.** *Id.* at 453.

**3.** 981 P.2d 109 (Alaska 1999).

**4.** *Id.* at 113, *quoting Linton v. State,* 880 P.2d 123, 130 (Alaska App.1994), *aff'd on reh'g* 901 P.2d 439 (Alaska App.1995).

Linehan in Hope, and that Carlin killed Leppink there.

This evidence, which was uncontested, clearly demonstrates Leppink's relationship with Linehan. He was infatuated with her, didn't trust her and had very confused feelings about her, and would likely respond to the Hope note by trying to find her. Linehan knew this and wrote the Hope note. Linehan contended that she wrote the note to divert Leppink so that she could have her romantic encounter with Hilke. The State contended that Linehan wrote the Hope note to lure Leppink to Hope so Carlin could kill him. But the relationship between Leppink and Linehan was clear—he had strong and conflicted feelings about her and she could easily manipulate him. In short, there was no reason to admit the accusations that Leppink made in his letter to his parents to explain that relationship or show his "actions shortly before the murder." It is undisputed what Leppink did, why he did it, and how he felt. The question was Linehan's intent when she wrote the Hope note.

The State also argues that the accusations that Leppink made in the note were admissible to explain Linehan's cooperation with the state troopers during her May 5 interview. The State contends that the defense argued that Linehan's conduct during the investigation was consistent with her innocence—that Linehan had cooperated by volunteering knowledge about the Desert Eagle gun, had acknowledged her relationship with Leppink, admitted her involvement in drafting the Hope note, and did not make a claim to the insurance proceeds or under Leppink's will. The State argued that it needed to explain Linehan's cooperation by showing that, before she talked to the troopers, she had been informed about Leppink's letter.

There are several problems with the State's claim that it needed to introduce the accusation in the letter. First, it is undisputed that, on May 4, a day before Linehan's interview with the troopers, she talked to Lane Leppink, Kent Leppink's brother, who told her that "she should be careful because [his] parents would blame her." So Linehan had already been informed that she was a suspect before she talked to the troopers.

Second, as Judge Mannheimer points out in the opinion of the court, it is unclear when Linehan was actually informed about the letter—it could well have been after she talked to the troopers on May 5. Furthermore, the trial court instructed the jury that Leppink's letter was only admissible to show Leppink's state of mind and was not admissible for any other purpose.

In conclusion, courts appear to universally conclude that admission of "accusations from the grave" similar to the kind admitted in this case are highly prejudicial. The reasons which the State has advanced for admitting this evidence do not stand up to analysis. The State's case against Linehan was circumstantial, and the evidence was subject to different interpretations and was hardly overwhelming. We accordingly conclude that Linehan's conviction must be reversed.